IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ROGER LAMUNION,               )
                                        )
         Plaintiff,            )
                                          )
          v.               )       No. 3:18-cv-01019-JD-MGG
                                          )
FULTON COUNTY, INDIANA,    )
                                          )
         Defendant.      )

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

For many years a nativity scene has been erected prominently on the lawn of the Fulton County Courthouse. This display—clearly one of the preeminent symbols of Christianity—consists of a manger constructed from bales of hay and figurines representing several figures present in the story of the birth of Christ: Mary, Joseph, and the Baby Jesus; the three wise men; various animals; and even an angel positioned over the other figures. For the past three years, although not before that, Fulton County ("the County") has placed four small (secular) figurines in relative proximity to the crèche, although these figurines clearly are not part of the same display. The County lacks a valid secular purpose for displaying its nativity scene, its display has the principal effect of advancing religion, and a reasonable person would deem it to be an endorsement of religion. As such, the display runs afoul of the Establishment Clause. All requirements for preliminary relief are met in this case, and a preliminary injunction should issue without bond prohibiting the County from erecting its display during the upcoming winter holiday season.

At the outset, the plaintiff acknowledges the unusual nature of a request for preliminary

1

relief this late in litigation. The parties had originally agreed to a case management schedule that would have allowed for the completion of summary-judgment briefing in sufficient time to obviate the need for a preliminary injunction. Unfortunately, the current public-health crisis has delayed the discovery process, thus necessitating the present request. The plaintiff believes that it would be appropriate for his preliminary-injunction request to be consolidated with a final hearing on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.[1]

### STATEMENT OF FACTS[2]

It is anticipated that the following facts with be adduced prior to any preliminary-injunction hearing in this cause:

The Fulton County Courthouse ("the Courthouse") is a historic building located in Rochester, Indiana, the county seat. Located inside the Courthouse are not only the county courts but also several other government offices, such as the offices of the county clerk, the county prosecutor, and the county's probation department. Since 2000, the Courthouse has been listed on the National Register of Historic Places. The Courthouse, like many other county courthouses in Indiana, is surrounded by a sizeable lawn that, together with the Courthouse, occupies an entire square block in Rochester's central downtown business district. The Courthouse lawn is bordered on the west by Main Street and on the south by Ninth Street, the two primary thoroughfares in Rochester. The Courthouse lawn contains four permanent monuments: a memorial dedicated to the Potawatomi "Trail of Death"; a memorial dedicated to Rochester Normal University; and two

---

[1]     The merits of this case were previously briefed in conjunction with the County's Motion to Dismiss (Dkt. 14). Portions of this brief are taken, substantially verbatim, from the plaintiff's response in opposition to that motion (Dkt. 18).

[2]     The plaintiff intends to conduct a deposition of the County pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. He reserves his right to supplement this factual statement with information adduced in that deposition or otherwise ascertained during discovery.

war memorials.  Aside from these four permanent monuments, the lawn contains a few trees but consists largely of open green space.

Each winter, however, the County erects on the south side of the Courthouse lawn a sizeable nativity scene.  This crèche consists of a manger constructed from bales of hay and figurines representing several figures present in the story of the birth of Christ: Mary, Joseph, and the Baby Jesus; the three wise men; various animals; and even an angel positioned over the other figures.  A photograph of the crèche is attached to the plaintiff's pleadings:



This crèche has been displayed by the County on the Courthouse lawn each year for at least the past nine years, and likely for longer.

In addition to the crèche, each year the County erects a "Santa house" on the west side of the Courthouse lawn. This "Santa house" is a small structure that children may visit for a couple of hours each weekend day in order to sit on Santa's lap and tell Santa what they would like for Christmas. This "Santa house" is physically removed from the crèche and is not a part of the same display as the crèche. For the past three years, but not before that, the County has also placed four small figurines on the Courthouse lawn: a Santa figurine, a snowman figurine, a reindeer figurine with lights, and a candle figurine. These four figurines are placed on the southwest side of the Courthouse law, a short distance—perhaps ten or twenty yards—from the crèche display:



While these four figurines are in relative proximity to the crèche, they are not part of the same

display.

The plaintiff, Roger LaMunion, resides in Argos, Indiana, a small town in Marshall County, Indiana, that is not far from Rochester.  Mr. LaMunion previously worked in Rochester, near the Courthouse, although he is now retired.  Even though he no longer travels to Rochester on a daily basis, each December he will make multiple trips to Rochester in order to run errands or for other personal reasons.  As Rochester is not a large city, these trips will inevitably require him to pass the Courthouse lawn and the nativity scene displayed there.  Mr. LaMunion objects to the display of the crèche on the Courthouse lawn as he does not believe that local government should be endorsing a religious faith.  However, his trips to Rochester during December bring him into direct and unwelcome contact with the display.

PRELIMINARY INJUNCTION STANDARD

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear.  In order to determine whether a preliminary injunction should be granted, the Court must weigh several factors:

    (1)  whether the plaintiffs have established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

    (2)  whether the plaintiffs' remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

    (3)  whether the threatened injury to the plaintiffs outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

    (4)  whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractor, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *Gen. Leaseways, Inc.*

5

*v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

ARGUMENT

## I.      The plaintiff is likely to prevail on the merits of his legal claim

In denying the County's request that this cause be dismissed on the pleadings, this Court noted the pendency of a similar case, raising substantially identical issues, in the Southern District. (*See* Dkt. 25 at 1).  Summary judgment has since issued in favor of the plaintiff in that case.  *See Woodring v. Jackson Cnty.*, __ F. Supp. 3d __, 2020 WL 2085057 (S.D. Ind. Apr. 30, 2020), *appeal pending*, No. 20-1881 (7th Cir.).  Although that decision is being appealed, this case cannot be meaningfully distinguished from *Woodring*.

### A.      Background to the Establishment Clause

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  This provision, among other things, "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"  *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring)).  In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Court established a three-part test to determine whether governmental action runs afoul of the Establishment Clause: in order to pass constitutional muster, (1) the action must have a secular purpose, (2) the action must have a principal or primary effect that neither advances nor inhibits religion, and (3) the action must not foster excessive governmental entanglement with religion.  *Id.* at 612-13.  In *McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005), the Court stressed that the "purpose" prong of *Lemon*, and hence the Establishment Clause, is violated

6

"[w]hen the government acts with the ostensible and predominant purpose of advancing religion." *Id.* at 860.  In addition to *Lemon*, the Supreme Court has advanced "other approaches by which an Establishment Clause violation can be detected."  *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012) (*en banc*).  One of these approaches is termed the "endorsement test," which has its roots in Justice O'Connor's concurrence in *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring), and was subsequently adopted by the entire Court in *County of Allegheny*, 492 U.S. at 592-93.  Under this test, courts

> ask[] whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.  When [a court] find[s] that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred*, the Establishment Clause has been violated.

*Freedom From Religion Foundation v. City of Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000) (internal quotation and citation omitted) (emphasis in original); *see also, e.g.*, *Freedom From Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038, 1045-46 (7th Cir. 2018); *Elmbrook*, 687 F.3d at 850 (describing the endorsement test as "a legitimate part of *Lemon*'s second prong").[3]

Most recently, however, the U.S. Supreme Court has retreated from both the traditional *Lemon* test and endorsement analysis in the case of at least some long-standing permanent displays.  *See American Legion v. American Humanist Ass'n*, __ U.S. __, 139 S. Ct. 2067, 2089-90 (2019).  *American Legion* arose as a challenge to the constitutionality of the "Bladensburg Peace Cross," a

---

[3]     The other approach to Establishment Clause jurisprudence is the "coercion test" derived from the Supreme Court's decisions in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), and *Lee v. Weisman*, 505 U.S. 577 (1992).  This test "seeks to determine whether the state has applied coercive pressure on an individual to support or participate in religion."  *Elmbrook*, 687 F.3d at 850.  Applying the coercion test, the Supreme Court has emphasized that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *Lee*, 505 U.S. at 592, and the federal courts have thus "been particularly vigilant in monitoring compliance with the Establishment Clause" in the public-school context, *see Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).  Inasmuch as this case does not involve religion in public schools, the coercion test is not relevant.

32-foot high Latin Cross erected on public property as a memorial to the local soldiers who had given their lives during the First World War.  *Id.* at 2074-78.  In upholding this display, the Court noted first that the choice of the Latin Cross to commemorate deceased soldiers was unsurprising insofar as not long after the war the cross had become a non-religious symbol of the conflict, the losses it caused, and the sacrifices it required.  *Id.* at 2075-76.  The Court noted that the cross itself was not solely or necessarily a religious symbol, for "there are many contexts in which the symbol has also taken on a secular meaning.  Indeed, there are instances in which its message is now almost entirely secular."  *Id.* at 2074; *see also id.* at 2075 (describing the symbol's secular use in registered trademarks and by organizations such as the Red Cross).

With this as an introduction, a four-justice plurality in *American Legion* noted that the *Lemon* test fails to provide a workable framework in all cases and that "[i]n many cases, this Court has either expressly declined to apply the test or has simply ignored it."  *Id.* at 2081 (plurality) (citing cases).  Ultimately, the plurality concluded that:

> [f]or at least four reasons, the *Lemon* test presents particularly daunting problems in cases, including the one now before us, that involve the use, for ceremonial, celebratory, or commemorative purposes of words or symbols with religious associations.  Together these considerations counsel against efforts to evaluate such a case under *Lemon* and toward application of a presumption of constitutionality for longstanding monuments, symbols, and practices.

*Id.* at 2081-82 (plurality).  A majority of the Court articulated the reasons the *Lemon* test is not appropriate to evaluate the constitutionality of "longstanding monuments, symbols, and practices":

1. First, determining the original purpose of a monument, symbol, or practice that was established long ago "may be especially difficult."  *Id.* at 2082.

2. Second, "even if the original purpose of a monument was infused with religion, the passage of time may obscure that sentiment."  *Id.* at 2083.

3. Third, "just as the purpose for maintaining a monument, symbol, or practice may evolve, the message conveyed may change over time," for, "[w]ith sufficient time, religiously expressive monuments, symbols, and practices can become embedded features of a

community's landscape and identity." *Id.* at 2084 (internal quotation and alteration omitted).

4. And fourth, "when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially to the local community for which it has taken on particular meaning." *Id.*

Having recited these four reasons, the Court concluded that they demonstrated "that retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones.  The passage of time gives rise to a strong presumption of constitutionality." *Id.* at 2085.

**B.**    ***American Legion* is inapplicable and this case must therefore be resolved through traditional Establishment Clause analysis**

*American Legion* does not mandate that the same presumption of constitutionality be afforded to the temporary display of a religious crèche that was afforded to the century-long display of a memorial that was determined to have taken on secular meaning.  In upholding the display of the "Bladensburg Peace Cross," the Court stressed the "presumption of constitutionality" that would be afforded "longstanding monuments, symbols and practices." *Id.* at 2082 (plurality).  Although the Court did not further define "longstanding," four justices analogized to the centuries-long tradition of legislative prayer.  *Id.* at 2087-89 (plurality). Absolutely no definition of "longstanding," however, applies to a nativity scene that is erected only for a handful of weeks each year, and there is no hint in *American Legion* that temporary displays can be "longstanding." *Cf. Woodring*, 2020 WL 2085057, at *9 n.3 ("*American Legion* did not give a precise definition of the word 'longstanding,' but the monument it concerned, a 32-foot tall Latin cross memorializing those who perished in World War I, was erected in 1925, making it more than 90 years old when the Supreme Court ruled in 2019 that it did not violate the Establishment Clause.") (citation omitted).  Although discovery will reveal the number of years

the crèche has been displayed by the County, the plaintiff only recalls observing it since approximately 2010. *American Legion* simply does not apply to a temporary display that lacks the history of the "Bladensburg Peace Cross."

This conclusion is buttressed by other elements of the "Bladensburg Peace Cross" that were stressed in *American Legion* but are absent here. As noted above, the Court began its discussion by examining the secular aspects of the cross at the time of its erection as a memorial to fallen soldiers, for the symbol was widely recognized as something more than a Christian symbol, as it quickly "developed into a central symbol of the conflict." *Id.* at 2075 (internal quotation and citation omitted). The contrast to the County's nativity display is stark: there simply is nothing secular about a crèche itself, for it is inherently and exclusively religious. As the Seventh Circuit has noted, a nativity scene "is an unequivocal Christian symbol" that serves as "[a] vivid tableau of the birth of Jesus Christ" and "brings Christianity back into Christmas." *American Jewish Congress v. City of Chicago,* 827 F.2d 120, 127 (7th Cir. 1987) (citations omitted). Of course, under traditional Establishment Clause analysis, even an inherently religious symbol can be mitigated by context—the Court in *Lynch* upheld a crèche displayed in a public park along with Christmas-oriented decorations and figures, that "detract[ed] from the crèche's religious message," *County of Allegheny*, 492 U.S. at 598 (describing the holding in *Lynch*)—but, unlike the Latin Cross, the Court has never hinted that the crèche itself had secular attributes. Clearly it does not.[4]

Finally, as noted, the Court in *American Legion* also stressed the dislocation and antipathy that may arise when longstanding monuments are torn down. 139 S. Ct. at 2084-85. In applying these principles, the Court again employed language stressing the permanence of the 32-foot tall

---

[4] Unlike the Latin Cross, one would be hard-pressed to find a non-religious company or charitable organization that has adopted the crèche as its trademark or symbol. *Cf. American Legion*, 139 S. Ct. at 2074-75 & n.2.

"Bladensburg Peace Cross": it was "established," *id.* at 2082; it was an "embedded feature," *id.* at 2084; and it would have to be torn down, *id*. at 2085. But the nativity scene at issue here is not a permanent display.  It is not embedded.  It will not have to be removed. It is erected for only approximately six weeks a year and can easily be moved to a private location.

The presumption of constitutionality applied to the long-standing permanent display at issue in *American Legion* is inapplicable here.  Inasmuch as the Supreme Court "has not overruled *Lemon v. Kurtzman*," *Georgia v. Public.Resource.Org, Inc.*, __ U.S. __, 140 S. Ct. 1498, 1520 n.6 (2020) (Thomas, J. dissenting), traditional Establishment Clause jurisprudence applies.

**C.      The County's predominant purpose in erecting the crèche is religious**

The Supreme Court has noted that the "touchstone" for the analysis of purpose under *Lemon* "is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *McCreary County*, 545 U.S. at 861 (internal quotation and citations omitted).  This is because, "[w]hen the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."  *Id.* (internal citation omitted). "*Lemon* said that the government action must have 'a secular purpose,' and after a host of cases it is fair to add that although a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective."  *Id.* at 864 (internal citation and alteration omitted).

In *McCreary County*, the Court affirmed a preliminary injunction against two Kentucky courthouse displays containing the Ten Commandments, concluding that the purpose of the displays was illegitimate and that there was therefore no need to analyze the displays under any

other Establishment Clause test.  *Id.* at 881.  In so doing, the Court stressed that in making this determination a court should look at "readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts."  *Id.* at 862.  This assessment of "[p]urpose is determined from the perspective of an objective observer . . . [who] is credited with knowledge of 'readily discoverable fact.'" *American Civil Liberties Union of Ky. v. Grayson Cnty.*, 591 F.3d 837, 848 (6th Cir. 2010) (quoting *McCreary County*, 545 U.S. at 862).  During the course of the litigation in *McCreary County*, the counties had modified solitary Ten Commandments displays by adding certain secular documents (and then later moved in additional secular documents).  The Court stressed that in assessing purpose it was necessary and appropriate to examine not just the final display, but all of the government's actions leading to that display.  545 U.S. at 866.  The contrary argument, that the purpose inquiry had to focus just on the final manifestation of the display, ignoring all that went before it, "just bucks common sense: reasonable observers have reasonable memories, and our precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'" *Id.* at 866 (internal citation omitted) (alteration in original).

In this case, a reasonable observer, with a reasonable memory, would know that for years the crèche display, a preeminent symbol of Christianity, occupied its position of prominence on the lawn of the Fulton County Courthouse without any counter-visual.  Only for the past three years have a small number of secular figurines been added to the Courthouse lawn, although even then these figurines are physically removed from the crèche and pale in comparison to the crèche both in size and in message: while the message conveyed by the nativity scene is clear, the secular figurines appear as a loose assortment of unrelated thoughts and do not appear to convey any message at all.  The appearance of a single candle, which does not necessarily have any significance to the holiday season at all, is particularly curious.  As the Seventh Circuit noted long

ago, "[t]he Nativity scene, with its figures of Mary, Joseph, the infant Jesus, the Magi, shepherds, angels, and animals, is an unequivocal Christian symbol, unlike the Christmas tree and the reindeer and the tinsel and Santa Claus." *American Civil Liberties Union of Ill. v. City of St. Charles*, 794 F.2d 265, 271 (7th Cir. 1986). The erection of this "vivid tableau of the birth of Jesus Christ," *id.* at 272, lacks a secular purpose. And, *McCreary County* establishes that this religious purpose is not dissipated merely because a handful of secular objects, removed from the crèche, are placed on the Courthouse lawn as well.

In *American Humanist Ass'n v. Baxter County*, 143 F. Supp. 3d 816 (W.D. Ark. 2015), the court concluded that the county's display of a nativity scene on the county courthouse lawn was unconstitutional under *Lemon*'s purpose prong. *Id.* at 826. The display had been erected on the courthouse for more than forty years, although "in recent years it has acquired a few additional figures depicting Santa Claus and reindeer." *Id.* at 819. However, shortly before litigation was filed, the County also added a disclaimer that the display saluted liberty and freedom and that stated simply, "[w]hatever your religion or beliefs, enjoy the holidays." *Id.* at 820. The court indicated that although this late disclaimer "might be significant under the 'effect' prong of the *Lemon* test, in the Court's view it has very little probative value as to the County's purpose in erecting the crèche in the first place." *Id.* at 826. Similarly, in this case the addition of a small number of secular figurines, wholly removed from the nativity scene itself, has absolutely no bearing on the County's religious purpose in displaying its crèche on the Courthouse lawn. *See also Woodring*, 2020 WL 2085057, at *11 ("Because the only evidence in the record indicates that the County's purpose in displaying the Nativity scene was religious, the display does not pass the purpose test.").

The County cannot dispute that the display of a stand-alone crèche at the seat of

government evinces a religious purpose.  It does.

> **D.**   **The County's display of the crèche represents an impermissible endorsement of religious belief**

In assessing whether the nativity scene runs afoul of the "endorsement test," this Court is "charged with the responsibility of assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion."  *Books v. City of Elkhart*, 235 F.3d 292, 304 (7th Cir. 2000) (citing *County of Allegheny*, 492 U.S. at 597).  One need only view the nativity scene itself—an image of which is reproduced above—to conclude that the County has endorsed religious belief.

As noted, the Supreme Court's endorsement analysis was developed in *Lynch* and *County of Allegheny*.  In the former case, a city erected a holiday display in a park.  The display contained a crèche and Christmas-oriented decorations and figures, "including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, [and] a large banner that reads 'SEASONS GREETINGS.'"  465 U.S. at 671.  Chief Justice Burger, writing for the Court, applied the *Lemon* test, emphasizing that the Establishment Clause "erects a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."  *Id.* at 679 (internal quotation and citation omitted).  The Court concluded that in this instance, the display as a whole had the secular purpose of celebrating the Christmas holiday and depicting its origins.  *Id.* at 681.  Concurring in *Lynch*, Justice O'Connor analyzed the display through endorsement analysis, as a "clarification of our Establishment Clause doctrine."  *Id.* at 687 (O'Connor, J., concurring).  The question, in her view, was whether the display of the crèche "communicate[s] a message that the government intends to endorse the Christian beliefs represented by the crèche."  *Id.* at 692 (O'Connor, J., concurring).  Applying this test, she

concluded that there was no constitutional violation as "[t]he evident purpose of including the crèche in the larger display was not promotion of the religious content of the crèche but celebration of the public holiday through its traditional symbols." *Id.* at 691 (O'Connor, J., concurring). "In Justice O'Connor's concurring view, the religious symbolism of the . . . crèche was effectively muted by the enveloping host of nonreligious artifacts associated with the secular aspects of the Christmas holiday." *Amancio v. Town of Somerset*, 28 F. Supp. 2d 677, 679 (D. Mass. 1998).

In *County of Allegheny*, the Court considered two holiday displays on government property. The first was a crèche erected on the main stairway of the county courthouse where it was placed near poinsettia plants and small evergreens decorated with red bows. 492 U.S. at 580. The second was a Christmas tree, a menorah, and a sign saluting liberty at the entrance to the area's city-county building. *Id.* at 581-87. The Court concluded that the former display was unconstitutional:

> Under the Court's holding in *Lynch*, the effect of a crèche display turns on its setting. Here, unlike in *Lynch*, nothing in the context of the display detracts from the crèche's religious message. The *Lynch* display composed a series of figures and objects, each group of which had its own focal point. Santa's house and his reindeer were objects of attention separate from the crèche, and had their specific visual story to tell. Similarly, whatever a "talking" wishing well may be, it obviously was a center of attention separate from the crèche. Here, in contrast, the crèche stands alone: it is the single element of the display on the Grand Staircase.

*Id.* at 598. It made no difference to the Court in *County of Allegheny* that there were other secular decorations elsewhere in the courthouse as "[t]he record demonstrates that the crèche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building." *Id.* at 598 n.50. On the other hand, the Court concluded that the display outside of the city-county building—which contained a menorah, a Christmas tree, and a sign celebrating liberty—was constitutional. "The combined display of the tree, the sign, and the menorah [did not have] the effect of endorsing both Christian and Jewish faith, [but] simply recognizes that both Christmas

and Chanukah are part of the same winter-holiday season, which has attained a secular status in our society." *Id.* at 616.

In digesting how to apply the Supreme Court precedent concerning crèche displays, a district court faced with the issue noted that "[w]hile the Court has attempted to achieve consistency in its approach to Christmas displays, the fact-specific nature of its decisions provides a trial court with a decisional framework based, as Justice Blackmun intimates [in *County of Allegheny*], more on a visual appraisal than a cerebral assessment." *Amancio*, 28 F. Supp. 2d at 681. This visual appraisal must answer the question, "Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?" *Elewski v. City of Syracuse*, 123 F.3d 51, 53 (2d Cir. 1997). Applying this approach, courts have uniformly concluded that stand-alone crèche displays on governmental property send a definite message of religious endorsement. *See, e.g.*, *Smith v. County of Albemarle*, 895 F.2d 953, 958 (4th Cir. 1990) (solitary crèche on the front lawn of the county office building conveyed an "unmistakable message. . . of governmental endorsement"); *American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561, 1567 (6th Cir. 1986) ("the direct and immediate effect" of a stand-alone nativity scene on the lawn of a city hall "is endorsement of a particular religion"). After all, "[a] crèche standing alone without any of the nonreligious symbols of Christmas affirms the most fundamental of Christian beliefs—the birth of Jesus was not just another historical event." *City of Birmingham*, 791 F.2d at 1566. Courts have reached the same conclusion under circumstances where a crèche or nativity scene, although in proximity to secular items, is presented in a manner that would cause a reasonable observer to nevertheless conclude that it is a stand-alone display. In *American Jewish Congress*, for instance, a crèche was displayed in the Chicago City Hall, which also contained—at various locations—a large Christmas tree, wreaths, and a

mechanical Santa Claus with two reindeer and a sleigh in which donations could be made.  *See* 827 F.2d at 122.[5]  These decorations were displayed anywhere from ten to ninety feet away from the nativity scene, and other seasonal decorations were still further away.  *Id.*  The court rejected the argument that the entire City Hall was a single display because "the evidence supports the conclusion that the nativity scene was self-contained, rather than one element of a larger display." *Id.* at 125.  The items close to the nativity scene were not thematically related to it, and "[i]n this case, therefore, unlike *Lynch*, the secularized decorations in the vicinity of the nativity scene were not clearly part of the same display."  *Id.* at 126; *see also, e.g.*, *American Civil Liberties Union of Central Ohio v. County of Delaware*, 726 F. Supp. 184, 189-90 (S.D. Ohio 1989) (nativity scene on courthouse lawn that also contained a flagpole, three war memorials, and a decorated "peace tree" deemed unconstitutional as the nativity scene must be viewed on its own).

This line of cases should represent the end of the inquiry in the case at bar.  Although the County has earlier insisted that he challenged display "contains both religious and non-religious components" (Dkt. 15 at 12), that is simply not true.  To the contrary, the "Santa house" on the west side of the Courthouse lawn—the challenged crèche is on the south side of the lawn—is physically removed from the crèche, is not part of the same display, and does not in any way dull the religious impact or message of the crèche.  The seemingly random assortment of four small figurines, placed on the southwest side of the Courthouse lawn closer to the crèche, is also not part of the same display.  Indeed, not only is the nativity scene self-contained and physically removed from the secular figurines but it is on an entirely different physical level.  A sudden but substantial slope in the lawn, which appears to correspond to a staircase on the walkway leading into the Courthouse, separates the crèche from the other figurines (as do what appear to be two ground-

---

[5]     *American Jewish Congress* pre-dates *County of Allegheny*, and the court therefore relied on *Lemon* and *Lynch*.  *See* 827 F.2d at 125-28.

level lights on the elevated portion of the lawn).  As noted, the Seventh Circuit in *American Jewish Congress* refused to consider secular elements as close as ten feet away from a nativity scene to constitute part of the same display.  To the extent that endorsement analysis can be reduced to a mathematical computation—and it cannot—the secular elements are even further removed from the challenged display.  That should be the end of the endorsement inquiry.

But even were the assortment of four small figurines deemed part and parcel of the same display as the crèche, the display is still unconstitutional.  After all, there is a substantial middle ground between cases such as *American Jewish Congress*, *Smith*, and *County of Birmingham* where a religious display lacks any secular adornment and cases where such a display loses its religiosity because it is part of a larger display awash in secular symbols displayed on par with the religious ones, *see, e.g.*, *Doe v. City of Clawson*, 915 F.2d 244, 245 (6th Cir. 1990) (nativity scene contained "four evergreen trees with lights and stars, two Christmas gift packages with large bows, a Santa Claus figure standing nearby at the corner of the building, a large 'Noel' sign, and holiday roping on the building"); *Mather v. Village of Mundelein*, 864 F.2d 1291, 1292 (7th Cir. 1989) (display contained, in addition to the nativity scene, "many other symbols of the season—a Santa Claus and sleigh, carolers, snowmen, carriage lights, wreath, and two soldiers in the shape of nutcrackers").  Within this middle ground, courts have not hesitated to hold unconstitutional displays containing secular symbols if the religious symbology remains dominant.  This is obvious, of course, from *County of Allegheny* itself, where the interior display was deemed unconstitutional even though the crèche was located near decorated trees and holiday flowers.  *See* 492 U.S. at 580.  Other cases reach this conclusion even more explicitly.  For instance, in *Amancio* a town created a holiday display on the front lawn of its town hall consisting of "a Nativity crèche, holiday lights, a wreath, a Christmas tree and a plastic Santa Claus."  28 F. Supp. 2d at 678 (footnote omitted).

The court looked at the display in its entirety and concluded that it represented an endorsement of religion:

> Like the crèche in *Allegheny*, the crèche in Somerset is displayed prominently at the seat of local government. As in *Allegheny*, the crèche is the focal point of the display and there is no signage suggesting that anything is being celebrated other than the birth of Jesus. The Christmas tree does not dwarf the crèche as the towering tree did the menorah in *Allegheny*. Indeed, the tree is barely visible from the vantage of the crèche. And unlike *Lynch*, there is no superabundance of secular symbols to dilute the religious message of the crèche, only a rather forlorn Santa Claus stationed on the perimeter of the display. In sum, I am constrained to conclude that Somerset's display violates the Establishment Clause because the centrality of its nativity scene conveys to a reasonable viewer the constitutionally forbidden message that the Town of Somerset officially supports Christianity.

*Id.* at 681 (footnotes omitted); *see also Woodring*, 2020 WL 2085057, at *10 (nativity scene on courthouse lawn near figurines of "Santa and carolers" unconstitutional where "Santa and the carolers are placed to the far side of the display, away from the more centralized Nativity display," and "[t]he crèche is the vast majority of the display"). The bottom line is that endorsement analysis demands "a close examination of the context of the display to determine whether its overall effect endorses religion," considering "several factors, the most important of which are the location and physical setting of the display." *Harvey v. Cobb County*, 811 F. Supp. 669, 678 (N.D. Ga. 1993), *aff'd*, 15 F.3d 1097 (11th Cir. 1994).

Here, unlike the nativity scene itself, which represents a coherent display to tell an understood story with a constructed backdrop consisting of hay bales to represent a manger (under the watchful gaze of an angel), the secular figurines are notable for their randomness: they clearly represent after-thoughts more than any attempt to meaningfully celebrate the secular aspects of the holiday season. As noted, the candle in particular is curious as it is not clear whether it has any seasonal significance at all (and, if it does, it may not be a secular symbol but instead may represent the Christian Advent, *see, e.g.*, https://www.christianbook.com/page/advent/advent-candles (last

visited Sept. 15, 2020)).  Indeed, although not entire clear from the photograph reproduced above, these figurines appear to be facing in entirely random directions, which contrasts mightily to the careful construction of the nativity scene itself.  And, once more, the crèche is elevated in stature in part by being elevated in reality: it is placed on a higher plane, closer to the pedestrian walkway and the Courthouse entry, than are the secular figurines.  A reasonable observer would have no trouble concluding that the County endorses the religious aspects of Christmas, even in the unlikely event that she viewed the crèche as part of a larger display that also contains secular figurines.

Two additional facts drive this conclusion home.  First, "the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears."  *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment).  Therefore, the reasonable observer will be aware that the secular figurines were only recently added to the Courthouse lawn and that the display, without these additions, had been erected annually for a lengthier period of time.  As noted above, a solitary crèche display on government property sends a powerful message of endorsement, and the reasonable observer will perceive that this message has been sent for years; to this observer, the display is business as usual.  And second, the reasonable observer will find particular relevance in the fact that the religious display has been erected in front of the seat of government—and, unlike the secular figurines, the nativity scene appears to be display in close proximity to the entrance of the Courthouse.  Both *County of Allegheny* and *American Jewish Congress* stress that, in this location, the perception of governmental endorsement is at its greatest.  *See County of Allegheny*, 492 U.S. at 600 (finding significance in the fact that the crèche was displayed in "the 'main' and 'most beautiful part' of the building that is the seat of county government" and concluding that "[n]o viewer could

20

reasonably think that it occupies this location without the support and approval of the government"); *American Jewish Cong.*, 827 F.2d at 128 (highlighting the fact that the crèche was located in city hall, "a setting where the presence of government is pervasive and inescapable").

Whether the crèche at issue in this case is viewed (as it should be) as a stand-alone display or as dominating a larger display that also contains a small assortment of secular symbols, a reasonable observer viewing the display could only reach one conclusion: the County has chosen to support and share the religious aspects of Christmas.  This is unconstitutional endorsement.

## II.   The remaining factors for the issuance of preliminary relief are also met in this case

### A.   Absent immediate relief, the plaintiff will suffer irreparable harm for which there is no adequate remedy at law

Absent a preliminary injunction the plaintiff will suffer irreparable harm for which there is no adequate remedy at law.  Of course, at this point it is well-established that the denial of constitutional rights is irreparable harm in and of itself.  "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").  Indeed, in the First Amendment context, the Supreme Court has noted specifically that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  *See also, e.g.*, *ACLU v. City of St. Charles*, 794 F.2d 265, 275 (7th Cir. 1986) (applying same principles to Establishment Clause context); *Freedom From Religion Found. v. Concord Cmty. Schs.*, 148 F. Supp. 3d 727, 741-42 (N.D. Ind. 2015) (same); *H.S. v. Huntington Cnty. Cmty. Sch. Corp.*, 616 F.

Supp. 2d 863, 879 (N.D. Ind. 2009) (same).

There is no adequate remedy at law that can address this irreparable harm.  *See, e.g.*, *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) (holding that "money damages are [an] inadequate" remedy for the loss of First Amendment freedoms).  Absent an immediate injunction, the plaintiff will be forced to endure the continuing violation of his constitutional rights.  Nothing more need be demonstrated.

        **B.**       **The balance of harms and the public interest favor an injunction**

As with the irreparable harm requirement, courts apply a *per se* rule as to the remaining preliminary-injunction factors once a plaintiff demonstrates a likelihood of success on the merits: "[v]indication of constitutional freedoms is in the public interest."  *See, e.g.*, *McIntire v. Bethel Sch.*, 804 F.Supp. 1415, 1429 (W.D. Okla. 1992).  An injunction will only force compliance with the clear requirements of constitutional law.  The public has a significant interest in ensuring that local governmental bodies comply with the First Amendment.  Moreover, the County may not contend that requiring it to comply with constitutional norms is harmful.  *See, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiffs'] First Amendment rights . . . then [the] claimed harm is no harm at all").

**III.**     **The injunction should be issued without bond**

The issuance of a preliminary injunction will not impose any monetary injuries on the County.  In the absence of such injuries, no bond should be required.  *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  To require a bond in the present case would be to condition the exercise of the plaintiff's constitutional rights on his ability to pay.  No bond should be required.

## CONCLUSION

The determination of whether a display or practice violates the Establishment Clause is necessarily "case-specific." *Elmbrook*, 687 F.3d at 850. The specifics at issue in this case demonstrate that the County's annual erection of a nativity scene in front of its Courthouse lacks a secular purpose and communicates a clear message of religious endorsement. A preliminary injunction should issue preventing this display from again being erected during the upcoming winter holiday season.

Gavin M. Rose
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN 46202
Ph:     317.635.4059
Fax:    317.635.4105
<grose@aclu-in.org>

*Attorney for the plaintiff*