IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROGER LAMUNION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:18-cv-01019-JD-MGG |
| | ) |
| FULTON COUNTY, INDIANA, | ) |
| | ) |
| Defendant. | ) |

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
Ph:    317.635.4059
Fax:   317.635.4105
<grose@aclu-in.org>

*Attorney for the plaintiff*

INTRODUCTION

Absent an injunction from this Court, this upcoming holiday season the Fulton County Courthouse ("the Courthouse") will prominently feature a depiction of the birth of Jesus Christ. Several photographs of this display appear in the record and, despite the defendant's ("County's") vigorous contentions to the contrary, it is readily apparent that several non-religious objects placed some distance from the crèche do not detract from the overwhelming and undeniable religious message of the display. The plaintiff has not unduly delayed in requesting a preliminary injunction, and an injunction against the crèche as currently constructed should issue.

ARGUMENT[1]

### I. Particularly in light of the COVID-19 pandemic, an evidentiary hearing is not necessary and the preliminary-injunction request should be consolidated with a final decision on the merits

As noted previously, an evidentiary hearing on a preliminary-injunction request is not necessary when the resolution of the request does not hinge on disputed facts. *See, e.g.*, *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 577 (7th Cir. 1999) ("[T]here is no general requirement that a district judge hear live testimony or conduct a [preliminary-injunction] hearing at all."); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("If genuine issues of material fact are created by the response to a motion for preliminary injunction, an evidentiary hearing is indeed required. But as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive.") (internal citations omitted). In the parties' Notice Regarding Oral Argument (Dkt. 45), the County indicated that it would reserve judgment on the propriety of an evidentiary hearing until after the completion of briefing. The only factual dispute apparent from

---

[1] All record citations in this brief are made to the page numbers assigned by this Court's electronic system rather than to any internal pagination.

the briefing concerns how long various secular objects have been displayed near the crèche at the center of this litigation. Although the plaintiff only recalls viewing these objects for the first time in 2016 or 2017 (Dkt. 44-1 at 3), he concedes that the County and the Optimist Club of Rochester ("Optimist Club") are in a better position to say how long these objects have been extant and defers to their recollections. No factual dispute exists that would render an evidentiary hearing necessary, and in light of the current pandemic no hearing should be conducted.

The plaintiff further maintains that a decision on preliminary injunction should be consolidated with a final decision on the merits pursuant to Federal Rule 65(a)(2). The discovery deadline has now passed, the legal issues have been fully briefed, and no disputed material facts exist. There is therefore no cause to further delay final judgment.

**II.     The plaintiff has not unduly delayed in requesting preliminary relief.**

The County begins its opposition to the preliminary-injunction motion by insisting that the motion should be summarily denied due to the plaintiff's purported delay in bringing the motion. If this Court concludes that consolidation is appropriate, there is no need to address this argument. Regardless, despite the County's reference to a "nearly two-year delay" in seeking injunctive relief (Dkt. 48 at 6), it is apparent that the County's only real objection must be that the plaintiff did not seek preliminary relief prior to the erection of the holiday display in 2019. After all, not until 2018 did the plaintiff learn that cost-free advocacy organizations such as the ACLU of Indiana might assist him in mounting a challenge to the display (Dkt. 48-3 at 33-35) and the initiation of this cause on December 20, 2018 (Dkt. 1) certainly did not allow for discovery, briefing, and a decision on a preliminary-injunction request to be accomplished that year.

To be sure, the plaintiff did not seek preliminary relief in 2019. The County's motion to dismiss was not denied until October 8, 2019 (Dkt. 25) and in November 2019 local press indicated

2

that the challenged display would be moved to a private location during the pendency of this lawsuit. (Dkt. 42-2 at 16). The plaintiff and his counsel therefore made a litigation decision that, once again, discovery, briefing, and a decision on a preliminary-injunction request would be difficult to complete prior to the 2019 holiday season. At the time, it had been hoped that summary judgment could be fully briefed well in advance of the 2020 holidays. Unfortunately, the COVID-19 pandemic and the County's initial opposition to conducting remote depositions prevented this. There has been no undue delay in seeking relief and, if this Court concludes that the challenged display is unconstitutional then no harm to the County can be said to result from an injunction.

### III. The plaintiff is likely to prevail on the merits of his legal claim

#### A. The plaintiff possesses Article III standing

Each December, Mr. LaMunion makes multiple trips to Rochester that bring him into direct and unwelcome contact with the nativity display that he challenges in this case: he runs errands at the Walmart or the Walgreens (the latter of which is directly across the street from the Courthouse), visits friends in the area, and will pass the Courthouse regularly to stop at the Rochester Meat & Deli Market just a few blocks further down Ninth Street. (Dkt. 44-1 at 4). In the Establishment Clause context, the Seventh Circuit has recognized the existence of injury sufficient for standing purposes if a person changes his route to avoid confronting a religious display, *see ACLU of Illinois v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir. 1986), or if he is forced to confront an objected-to-display during the course of his life in the community, *see Books v. City of Elkhart*, 235 F.3d 292, 300-01 (7th Cir. 2000); *Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir. 1994).

Quoting *Doe*, the Seventh Circuit in *Books* summarized well-established precedent:

> As we stated [in *Doe*], "direct and unwelcome exposure to a religious message cannot be distinguished from the 'injuries' of other plaintiffs who have had standing to bring claims under the Establishment Clause." [41 F.3d] at 1159. We then noted that both the Supreme Court and this court have found standing for constitutional

3

> challenges to religious conduct when the plaintiffs did not assume a special burden or alter their behavior. *See Lee v. Weisman*, 505 U.S. 577 (1992); *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 205, 224 n. 9 (1963); *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1164 n. 4 (7th Cir.1993); *Sherman v. Community Consol. Sch. Dist. 21 of Wheeling Township*, 980 F.2d 437, 441 (7th Cir.1992).

*Books*, 235 F.3d at 299-300 (internal parentheticals omitted); *see also ACLU of Illinois v. City of St. Charles*, 794 F.2d 265, 268-69 (7th Cir. 1986). Indeed, the fundamental principle that standing exists when plaintiffs come into "direct and unwelcome" contact with a religious display to which they object is also apparent from *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067 (2019). The individual plaintiffs in *American Legion* predicated their standing on the fact that "they have each regularly encountered the Cross while driving in the area, believe the display of the Cross amounts to governmental affiliation with Christianity, are offended by the prominent governmental display of the Cross, and wish to have no further contact with it." *American Humanist Ass'n v. Maryland-National Capital Park & Planning Comm'n*, 874 F. 3d 195, 202 (4th Cir. 2017), *rev'd sub nom. American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067 (2019). While two dissenting Justices would have held that the "'offender observer' theory of standing has no basis in law,'" 139 S. Ct. at 2098 (Gorsuch, J., joined by Thomas, J., concurring in the judgment), no other Justice questioned the plaintiffs' standing.[2]

Not satisfied with this, the County argues that Mr. LaMunion only suffers psychological harm similar to the harm deemed non-cognizable in *Freedom from Religion Foundation, Inc. v. Obama*, 641 F.3d 803, 807-08 (7th Cir. 2011), and *Freedom From Religion Foundation, Inc. v.*

---

[2] The Seventh Circuit is not alone in holding that "[a] plaintiff has standing to challenge a religious display where his stigmatic injury results from a 'personal[] confront[ation]' with the display." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017) (internal citation omitted) (alterations in original). Numerous other circuits have reached identical conclusions. *See, e.g.*, *Freedom from Religion Found., Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 479 (3d Cir. 2016); *American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379, 381 (9th Cir. 1996); *Murray v. City of Austin*, 947 F.2d 147, 150-51 (5th Cir. 1991); *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691-92 (11th Cir. 1987).

*Zielke*, 845 F.2d 1463, 1467-68 (7th Cir. 1988). But in neither of these cases was standing predicated on a plaintiff's direct exposure to an unwelcome religious display. In *Obama*, which arose as a challenge to a statute creating a "National Day of Prayer," the court concluded that its decisions holding "that persons who are obliged to view religious display in order to access public services, or reach their jobs" were inapplicable, for the plaintiffs in that case asserted no injury other than "disagreement with the President's action." 641 F.3d at 807-08. And in *Zielke*, the court determined standing absent where the only plaintiff who resided in proximity to the challenged display "did not demonstrate that she lives anywhere near Cameron Park, that the monument is visible in the course of her normal routine, or that her usual driving or walking routes take her past the park." 845 F.2d at 1469. That demonstration has been made here.

### B. *American Legion*'s presumption of constitutionality is inapplicable here but, even were that not so, the presumption is overcome by the County's selective approval of holiday messages

#### 1. *American Legion* is inapplicable

As described previously, the Supreme Court in *American Legion* articulated four reasons that the application of traditional Establishment Clause jurisprudence is not appropriate to evaluate the constitutionality of "longstanding monuments, symbols, and practices":

- First, determining the original purpose of a monument, symbol, or practice that was established long ago "may be especially difficult." 139 S. Ct. at 2082.

- Second, "even if the original purpose of a monument was infused with religion, the passage of time may obscure that sentiment." *Id.* at 2083.

- Third, "just as the purpose for maintaining a monument, symbol, or practice may evolve, the message conveyed may change over time," for, "[w]ith sufficient time, religiously expressive monuments, symbols, and practices can become embedded features of a community's landscape and identity." *Id.* at 2084 (internal quotation omitted).

- And fourth, "when time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially to the local community." *Id.*

5

To be sure, the plaintiff acknowledges that discovery has revealed that the crèche display at issue here has been displayed each winter for half a century. Nonetheless, *American Legion*'s presumption of constitutionality is inapplicable for two reasons.

1. For one, the longstanding nature of the "Bladensburg Cross" at issue in *American Legion* was deemed pertinent precisely because the symbol of the cross itself may take on secular meanings and possess secular purposes, and had done so in that case. By contrast, a depiction of the Nativity "is an unequivocal Christian symbol." *Am. Jewish Cong.*, 827 F.2d at 127 (quoting *City of St. Charles*, 794 F.2d at 271). It has no other meanings. "A vivid tableau of the birth of Jesus Christ, it brings Christianity back into Christmas." *City of St. Charles*, 794 F.2d at 272. The Court in *American Legion* went to great lengths to stress the manner in which the meaning of the cross had evolved over time. Even in the immediate aftermath of World War I, the cross was employed not as a religious symbol but as a symbol of the sacrifice of fallen soldiers. *See* 139 S. Ct. at 2085. Since then, it has appeared as part of many registered trademarks held by businesses and secular organizations, including Blue Cross Blue Shield, the Bayer Group, and some Johnson & Johnson products." *Id.* at 2074. And the International Committee of the Red Cross borrowed the symbol from the flag of Switzerland in order to invoke a message of neutrality. *Id.* at 2075.

None of this can be said, of course, about the Nativity. So far as counsel is aware, this visual depiction of the birth of Jesus Christ has not been adopted by any secular organizations or businesses. It has not taken on a multifaceted meaning similar to the cross's commemoration of the sacrifice of fallen soldiers. It has only one meaning: the celebration of a religious event of foundational importance to Christianity. To be sure, as the Supreme Court's endorsement jurisprudence makes clear, the inherent religiosity of a display may certainly be mitigated by context. *See, e.g.*, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 598-

6

99 (1989); *Lynch v. Donnelly*, 465 U.S. 668, 691-93 (1984) (O'Connor, J., concurring). But neither the Supreme Court nor any court has ever hinted that the crèche itself had secular attributes—clearly it does not. The fact that a symbol's religiosity may be mitigated by context is radically different from the Court's conclusion in *American Legion* that the "Bladensburg Cross" *itself*, regardless of context, was not inherently religious. The first three reasons articulated by the *American Legion* Court for applying a presumption of constitutionality to this monument revolved around the manner in which the purpose or message of the cross might evolve or prove difficult to ascertain due to the passage of time. *See id.* at 2082-84. But that is simply not a risk when the Nativity is displayed: such a display is unequivocally and undeniably religious by its very nature. It has no secular attributes, and *American Legion*'s presumption does not apply.[3]

    2.    Second, this presumption for certain longstanding monuments simply does not apply to temporary displays such as the crèche at issue in this case. The Court in *American Legion* repeatedly stressed the permanence of the 32-foot tall "Bladensburg Cross": it was "established," *id.* at 2082; it was an "embedded feature," *id.* at 2084; and if enjoined it would have to be physically torn down, *id.* at 2085. As noted, one factor considered by the Court was the antipathy that might arise when longstanding monuments are removed, an act that might be perceived as "aggressively hostile to religion." *Id.* These considerations, however, are inapplicable to a temporary display. The crèche at issue here is not embedded. It will not have to be removed. It is assembled separately each year and may easily be relocated to a private location.

Indeed, the distinctions between this case and *American Legion* are underscored by the fact that the display is owned and erected each year not by the County but by the Optimist Club, a local

---

[3]    It appears that *American Legion*'s presumption has only twice been applied to a religious display or symbol, and both cases arose as challenges to the constitutionality of the image of a cross. *See Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1331-33 (11th Cir. 2020) (cross monument in park); *Freedom From Religion Found., Inc. v. Cnty. of Lehigh*, 933 F.3d 275, 282-84 (3d Cir. 2019) (Latin cross on county seal).

7

nonprofit organization. Although the County may certainly be held liable for its decision to have a crèche erected on the Courthouse lawn—and it does not argue to the contrary—the fact that the display itself is privately owned entirely undermines any suggestion that its removal could be perceived as "aggressively hostile to religion." Should the Optimist Club decide to erect its display not on the Courthouse lawn but in front of a nearby business or church, the County clearly would not be acting with hostility toward religion. Indeed, these is no evidence that the County was perceived as religiously hostile in 2019 when it temporarily decided that the display would be erected in front of a local church. Just as *American Legion*'s presumption has not been applied to a display of the Nativity, it has never been applied to a temporary display rather than a permanent monument. For this reason, too, traditional Establishment Clause jurisprudence governs this case.[4]

2. Even if *American Legion*'s presumption of constitutionality is applicable, it is overcome by the County's selective approval of holiday messages

But even if *American Legion*'s presumption of constitutionality were applicable here, that presumption may be overcome by a demonstration of "discriminatory intent in the decision to maintain a design or disrespect based on religion in the challenged design itself." *County of Lehigh*, 933 F.3d at 281. After all, this is not a case where the County has been faced with no other requests to allow the display of imagery during the holiday season. To the contrary, in 2019 Northern Indiana Atheists sought permission to erect its own holiday display on the Courthouse lawn. (Dkt. 42-3). This request, however, was met only by the County's silence: it was not even addressed at a public meeting of the County Commissioners, notwithstanding the County's avowed

---

[4] It is worth noting that the County's nativity display does not even appear identical from year to year: in 2018 all three Wise Men appeared to the right of the manger, whereas in 2019 one appeared to the right of the manger, one appeared to the left of the manger, and one appeared directly in front of it; some of the animals have also been moved from year to year; and in years past a different angel figurine altogether was displayed. (*See* Dkt. 42 at 3-4). While these changes do not impact the message conveyed by the display, they certain undermine any contention that the display is permanent and longstanding in the same manner as is the "Bladensburg Cross."

position that any request to erect a display will be addressed at such a meeting. (Dkt. 42-2 at 4).

As has been often repeated, "the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)); *see also, e.g.*, *Larson v. Valente*, 456 U.S. 228, 244 (1982).[5] Not only was this fundamental principle not questioned (and certainly not repudiated) in *American Legion*, but the Court strongly implied that a different result might issue if "the names of any Jewish soldiers from the area were deliberately left off the list on the memorial [that is, the 'Bladensburg Cross'] or . . . the names of any Jewish soldiers were included on the Cross against the wishes of their families." 139 S. Ct. at 2089. This Court need not engage in a searching inquiry to find evidence of the County's "discriminatory intent" sufficient to overcome *American Legion*'s presumption: while ensuring that a visual depiction of the Nativity is erected each year in a prominent location on the Courthouse lawn, the County refused to even consider the inclusion of a nonreligious element.

### C. The crèche display runs afoul of traditional Establishment Clause jurisprudence

1. <u>The display represents an unconstitutional endorsement of religion</u>[6]

As described previously, in assessing whether the crèche in this case runs afoul of the "endorsement test," this Court is "charged with the responsibility of assessing the totality of the

---

[5] Although atheism is not itself a religion, the Seventh Circuit has held that, for purposes of the First Amendment's neutrality principle, "atheism may be considered . . . a religion" insofar as it occupies a comparable place in the minds of its adherents. *See Kaufman v. McCaughtry*, 419 F.3d 678, 681-82 (7th Cir. 2005); *see also, e.g.*, *Center for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 872-73 (7th Cir. 2014) (reaching identical conclusion with respect to secular humanism).

[6] In his previous brief, the plaintiff argued in part that the secular objects located near the crèche on the Courthouse lawn were displayed for the first time in recent years. (*See* Dkt. 39 at 20). Although the plaintiff does not recall the appearance of these objects prior to 2016 or 2017 (Dkt. 44-1 at 3 [¶ 9]), as noted at the outset he defers to the County's collective recollection and acknowledges that discovery undertaken since the filing of his earlier brief establishes that these objects have been placed near the crèche for a significantly longer period of time. The plaintiff and his counsel apologize for their misunderstanding.

circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion." *Books*, 235 F.3d at 304 (citing *County of Allegheny*, 492 U.S. at 597). Although the parties have spilt much ink debating the visual effect of the Courthouse lawn on the reasonable observer, ultimately photographs of the crèche—and the other elements displayed on the Courthouse lawn during the holiday season—appear in the record, and this Court need simply ask itself whether this images convey religious endorsement. Once again, the crèche is an "unequivocal Christian symbol," *Am. Jewish Cong.*, 827 F.2d at 127 (quoting *City of St. Charles*, 794 F.2d at 271), and it is indisputable that, if displayed alone, the image of the Nativity is unconstitutional—the Supreme Court held as much in *County of Allegheny*, 492 U.S. at 598, as did the Seventh Circuit in *American Jewish Congress*.

Likening this case to *Mather v. Village of Mundelein*, 864 F.2d 1291 (7th Cir. 1989)—which, like *American Jewish Congress*, predates *County of Allegheny*—the County nonetheless contends that its placement of secular elements near the crèche serves to dull the religious impact of the display. In so doing, however, it significantly overstates the impact that these secular elements have on the observer. Not only had the crèche challenged in *Mather* long been erected along "with lights on the [nearby] evergreens and a wreath and a banner over the main door [of the village hall]," but, once questions were raised concerning the display's constitutionality, the village "added a Christmas tree with lights and . . . many other symbols of the season—a Santa Claus and sleigh, carolers, snowmen, carriage lights, wreaths, and two soldiers in the shape of nutcrackers." *Id.* at 1292. As the district court's opinion in *Mather* makes clear, several of these secular elements were as large or larger than the religious figurines, and an effort was made to incorporate them into the nativity display: the Santa Claus and snowman were placed on opposite sides of the crèche, other images were "spread out" nearby, and the Christmas tree "was left close

10

to the center of the display." 699 F. Supp. 1300, 1302 (N.D. Ill. 1988), *rev'd*, 864 F.2d 1291 (7th Cir. 1989). In other words, *Mather* is on par with the display upheld in *Lynch*, which comprised

> many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large manner that reads "SEASON'S GREETINGS," and the crèche.

465 U.S. at 671. (The banner displayed in *Mather* similarly stated "Season's Greetings" or "Happy Holidays." *See* 699 F. Supp. at 1301.).

The contrast here is clear. Far from a seasonal display integrating secular and nonsecular symbology into a celebration of the season, the crèche stands alone, unadorned by any other imagery. To be sure, five secular figurines are placed in relative proximity to the crèche. Whether all of these figurines will have any effect whatsoever on many observers is a matter of some doubt: as noted previously, the small lit tree appears to be scarcely visible during daylight hours. Regardless, not only are these objects not incorporated into the nativity display to create a single message of seasonal celebration, but they are not even placed on the same plane as the Nativity: the Nativity is stationed on the elevated section of the lawn closest to the Courthouse itself, certainly the position of greatest reverence. On top of all this, spotlights are placed immediately in front of the crèche—and *only* the crèche—in order to light that scene separately from any of the other objects that the County insists are part of the same display. An image of the scene after dark appears in the record. (Dkt. 44-1 at 13). The illuminated Nativity cannot reasonably be interpreted as anything other than what it is—a celebration of the religious aspects of Christmas. The nearby secular objects do not dull the religious impact of the crèche during daytime hours either.

The County is left, then, with its reliance on two evergreen trees on the Courthouse lawn that are lit during the holiday season—one is not far from the crèche but the other is half a block

11

away—as well as on the "Santa house" adjacent to Main Street where children visit Santa Claus for a couple of hours each weekend day. With the possible exception of one of the evergreen trees, which is located in close proximity to the secular figurines, these items are even further removed from the Nativity than are these figurines: as noted, the second evergreen tree appears on the northwest corner of the lawn (the crèche is near the southwest corner), and the "Santa house" is adjacent to the street on the walkway leading to the west entrance of the Courthouse. The physical distance between these items and the crèche at issue here renders them irrelevant to the endorsement analysis: *American Jewish Congress* holds as much. In that case, a crèche was displayed in the Chicago City Hall, which also contained, anywhere from ten to ninety feet from the nativity scene, a large Christmas tree, wreaths, and a mechanical Santa Claus with two reindeer and a sleigh in which donations could be made. *See* 827 F.2d at 122. The Seventh Circuit, however, rejected the contention that the entire City Hall could be viewed as a single display, for "the evidence supports the conclusion that the nativity scene was self-contained, rather than one element of a larger display." *Id.* at 125. The items close to the nativity scene were not thematically related to it, and "[i]n this case, therefore, unlike *Lynch*, the secularized decorations in the vicinity of the nativity scene were not clearly part of the same display." *Id.* at 126. Even were it necessary to delve deeper, however, not only are the evergreen trees not dissimilar from the poinsettia plants and evergreen trees that did not save the display in *County of Allegheny*, 492 U.S. at 598-600, but from many angles the "Santa house" appears only as a red shed and does not readily appear as a decoration at all (*see* Dkt. 44-1 at 17). Indeed, the evergreen trees do not appear decorated at all during daytime hours—a photograph including one of the trees appears in the record (*see* Dkt. 44-1 at 11)—and the "Santa house," by design, is only occasionally opened.

In *Woodring v. Jackson County*, 458 F. Supp. 3d 1029 (S.D. Ind. 2020), *appeal pending*,

12

Judge Pratt recently concluded that a nativity display on a courthouse lawn transgressed the endorsement test even when the lawn also contained "lighted figures of Santa Claus, a sleigh, and reindeer" as well as "lighted figures of two adults and two children, standing in front of the outlined figure of a lamppost, giving the appearance of carolers." *Id.* at 1032. Concluded the court:

> A picture of the Courthouse lawn shows that Santa and the carolers are placed to the far side of the display, away from the more centralized Nativity display, which straddles the sidewalk subdividing the lawn. The crèche is the vast majority of the display because it is arranged to straddle the sidewalk, making it appear much larger than the solitary Santa figure. The carolers have been placed in the back of the display, lessening the attention they would draw from an observer.

*Id.* at 1041 (internal record citations omitted). So too here: whether or not the nearby secular figurines are considered part of the same display, it is undeniable that the display itself is dominated by the overtly religious celebration of the birth of Jesus Christ. To be sure, the court in *Woodring* also underscored the fact that the non-religious elements erected on the courthouse lawn in that case had only recently been moved in order to be incorporated into the nativity display, *see id.* at 1041-42, but that is a distinction without a difference given that the non-religious elements here have *never* been incorporated into the County's nativity display.[7]

### 2. The predominant purpose of the display is religious

Finally, in his previous brief the plaintiff demonstrated that the primary purpose of its Nativity display is religious and that the display therefore transgresses the first prong of *Lemon*. (*See* Dkt. 39 at 11-14). The County responds to this argument only in passing, suggesting the

---

[7] In passing, the County attempts to find relevance in the fact that its crèche is located outdoors rather than inside the Courthouse. To be sure, the Seventh Circuit underscored this fact in *Mather*, but it did so only to emphasize that "passers-by will see a grouping of symbols, most of which are secular." *See* 864 F.2d at 1293. In other words, the court's observation that the nativity display was located outdoors cannot be divorced from the display itself, which, as noted, incorporated numerous secular symbols that are simply not present in this case. Suffice it to say that, subsequent to *Mather*, the Supreme Court in *County of Allegheny* applied the same endorsement analysis to a display inside a courthouse and one outside a government building. *See* 492 U.S. at 598-602, 613-21. Courts subsequent to *County of Allegheny* have not hesitated to enjoin religious displays even when located outdoors. *See, e.g.*, *Smith v. County of Albemarle*, 895 F.2d 953, 958 (4th Cir. 1990); *Woodring*, 458 F. Supp. 3d at 1041; *Amancio v. Town of Somerset*, 28 F. Supp. 2d 677, 681 (D. Mass. 1998).

13

secular purposes of "celebrat[ing] the Holiday and . . . depict[ing] the origins of [Christmas]." (Dkt. 48 at 24 [quoting *Lynch*, 465 U.S. at 681]).  This argument, however, is largely duplicative of the County's erroneous argument that it has created a multi-faceted display that celebrates the holiday season as a whole rather than simply the religious aspects of that season.

The purpose inquiry in this case is answered by *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005).  In *McCreary County*, the Supreme Court—applying its early holding in *Stone v. Graham*, 449 U.S. 39, 41 n.3 (1980))—reiterated the self-evident principle that governmental display of the Ten Commandments should "presumptively be understood as meant to advance religion" even though the document also possesses historical relevance.  *See* 545 U.S. at 867 (quoting *Stone*, 449 U.S. at 41 n.3).  Said the Court: "[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction.  When the government initiates an effort to place this statement alone in public view, a religious object is unmistakable." *Id.* at 869.  A nativity scene, unadorned by counter-visuals capable of suggesting a different purpose, likewise fails under the first prong of *Lemon*.  *See, e.g.*, *Woodring*, 458 F. Supp. 3d at 1043; *American Humanist Ass'n v. Baxter County*, 143 F. Supp. 3d 816 (W.D. Ark. 2015).[8]  This conclusion is further buttressed by the County's failure to even consider the request by the Northern Indiana Atheists—despite its deposition testimony indicating that any request will receive consideration—to erect its own holiday display on the Courthouse lawn, clear evidence of the County's religious motivation that this Court need not blind itself to.  *See McCreary Cnty.*, 545 U.S. at 873 (An "implausible claim" of secular purpose "should not carry the day in a court of law any more than in a head with common sense.").

---

[8] In addressing *Lemon*'s purpose prong, the district court in *Woodring* relied in part on the fact that "the then-President of the Commissioners [had] publicly apologized for not having a nativity scene in the Courthouse yard." 458 F. Supp. 3d at 1042.  That fact parallels the exuberant "I agree! Trying my best!" from the County's Rule 30(b)(6) designate here when he was thanked for his efforts to retain the crèche on the Courthouse lawn.  (Dkt. 42-2 at 51).

**IV.     The remaining factors for preliminary relief are met**

As indicated previously, the Supreme Court has held that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  Although *Elrod* was a free-speech case, both the Seventh Circuit and several district courts within this circuit have applied this same principle to the Establishment Clause context.  (*See* Dkt. 39 at 21-22 [citing cases]).  The County's only support for its assertion that *Elrod* and similar cases should not be applied is the district court's decision in *Ditton v. Rusch*, No. 14-C-3260, 2014 WL 4435928 (N.D. Ill. Sept. 29, 2014). But *Ditton* distinguished itself from *Elrod* on two grounds: the plaintiffs there did not "allege that the constitutional violations were ongoing," and they were not likely to succeed on the merits.  *Id.*, 2014 WL 4435928, at *5 & n.4.  Neither is true here, and *Elrod* squarely applies.

The County finally argues that the public interest and balance of equities tip in its favor *even if* the Court concludes that its display is unconstitutional.  (Dkt. 48 at 28-29).  That contention flies in the face of the established notions that a government cannot claim to be harmed by a requirement that it comply with constitutional norms and that "injunctions protecting First Amendment freedoms are always in the public interest."  *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006).

## CONCLUSION

Given the stage of these proceedings, the plaintiff's preliminary-injunction request should be consolidated with a final decision on the merits.  Whether or not consolidated, however, the crèche as it has been displayed in recent years and as it will be displayed during the upcoming holiday season must be enjoined.

>                                              Gavin M. Rose
>                                              ACLU OF INDIANA
>                                              1031 E. Washington St.
>                                              Indianapolis, IN  46202
>                                              Ph:     317.635.4059
>                                              Fax:    317.635.4105
>                                              <grose@aclu-in.org>
>
>                                              *Attorney for the plaintiff*